# Illinois Official Reports

## Appellate Court

*People v. Maggio*, 2017 IL App (4th) 150287

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRIAN D. MAGGIO, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0287 |
| Filed | June 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 10-CF-1252; the Hon. Heidi N. Ladd, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Ryan R. Wilson, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Julia Rietz, State's Attorney, of Urbana (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Justices Holder White and Appleton concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Brian D. Maggio, was convicted at a January 2015 jury trial of one count of first degree murder. 720 ILCS 5/9-1 (West 2010). In March 2015, defendant was sentenced to 65 years in prison. Defendant appeals his conviction and sentence, arguing his trial counsel was ineffective and the trial court erred by (1) failing to instruct the jury on involuntary manslaughter and (2) considering his refusal to participate in the presentence investigation in aggravation at sentencing. Defendant also argues his fines have not been offset by his *per diem* credit. We affirm in part, vacate in part, and remand the cause with directions.

¶ 2                              I. BACKGROUND

¶ 3    Defendant does not challenge the sufficiency of the evidence. We thus limit our recitation of the facts to those necessary to resolve defendant's claims.

¶ 4    On July 21, 2010, defendant shot his brother, Mark Maggio, with a .357 derringer. Defendant and his brother were business partners and operated multiple stores. Though they were business partners, their personal relationship had deteriorated to the point where they no longer saw or spoke to one another and only communicated about the businesses through their lawyers or wives. Defendant managed a grocery store in Tolono, Illinois, while his brother managed a grocery store in Arcola, Illinois.

¶ 5    On July 21, 2010, defendant was working at the Tolono store. When he returned from lunch, he observed his brother's truck parked outside the Tolono store. Upon entering, defendant observed his brother and a store worker conversing near the dairy section of the store. Defendant approached and called his brother a derogatory name, allegedly in an attempt to entice his brother to leave. According to defendant, his brother stomped on his foot and punched him in the stomach, causing defendant to fall to the floor and his glasses to fall off. While defendant was on the floor, his brother allegedly kicked him several times. Defendant then pulled his firearm out of his pocket and pointed it at his brother, who allegedly froze for a moment and then began running to the door. Defendant followed his brother to the front of the store and shot him just before he exited the store. Defendant called 911, and several officers and emergency personnel were dispatched to the scene.

¶ 6    Lieutenant Curtis Apperson of the Champaign County sheriff's office was one of the investigators who arrived on the scene. Lieutenant Apperson informed defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and proceeded to interview defendant. Defendant recounted the above facts and told Lieutenant Apperson he shot his brother in self-defense. Lieutenant Apperson asked defendant what he meant by "self-defense," and defendant told Lieutenant Apperson he knew his brother often carried a pistol on his person or in his truck. Defendant also told Lieutenant Apperson his brother had threatened to physically harm and kill him in the past. Defendant was arrested and charged with the following four counts of first degree murder: (1) defendant intended to kill his brother, (2) defendant knowingly killed his brother, (3) defendant intended to cause great bodily harm to his brother, and (4) defendant knowingly acted to cause great bodily harm to his brother. See 720 ILCS 5/9-1 (West 2010).

¶ 7    At the January 2015 jury trial, defense counsel alluded to defendant's self-defense claim in opening statements. Defense counsel stated, in relevant part:

"People make split second decisions all the time, and [defendant] made that decision on July 21st of 2010. At that moment when he was about to shoot the gun, he believed that Mark, who had guns in his truck, who had carried guns, he thought his brother was going to shoot him first, so in a split second decision, he shot his brother in self[-]defense.

* * *

The evidence will be that as he's leaving the store, Mark starts to turn to his right, which is towards a wall, not towards his vehicle, but towards the wall as if turning back into the store, and what you'll also hear is that Mark lifted up his arm and started to point it towards [defendant], and [defendant] saw a glint, a flash of something. He didn't know what it was; he thought it was a gun, and [defendant] in that split second lifted the gun and pulled the trigger one time."

¶ 8        Lieutenant Apperson testified in the State's case-in-chief. Lieutenant Apperson testified defendant told him he shot his brother in self-defense and he knew his brother to carry a pistol on his person or in his truck. Lieutenant Apperson testified he understood defendant to mean he believed his brother was running to his truck to retrieve a weapon, even though defendant did not use those exact words. The State asked Lieutenant Apperson, "Did he say anything about I thought my brother had a weapon?" Lieutenant Apperson responded, "No." Defense counsel objected, arguing the State was leading the witness, but the objection was overruled. The State later asked Lieutenant Apperson, "Did [defendant] make any statement to you indicating that he thought his brother actually possessed a gun prior to the shooting?" Lieutenant Apperson responded, "No, he did not." The State then asked, "Did [defendant] make any statement to you indicating that he believed that Mark Maggio was actually in possession of a weapon of any kind before the shooting?" Lieutenant Apperson responded, "No." On redirect, the State elicited the following testimony:

"Q. [Defendant] never actually said I thought Mark was going to his truck?

A. That's correct.

Q. He never said I thought Mark was going to get a gun?

A. That's correct."

Defense counsel then objected, arguing the State was again leading the witness, and the trial court sustained the objection. During its closing argument, the State commented on these omissions.

¶ 9        Defendant testified at the trial, and his testimony was consistent with defense counsel's opening statement. Defendant testified he acted in self-defense and believed his brother was armed with a weapon because he saw his brother turn back toward him and raise his arm. When his brother raised his arm, defendant allegedly saw a flash he believed to be a weapon. Defendant also testified he wears glasses for nearsightedness, which were knocked off during the physical altercation prior to the shooting, and according to defendant, his .357 derringer is an inaccurate shot.

¶ 10        The trial court instructed the jury on first and second degree murder, as well as self-defense, and provided the jury with three verdict forms: (1) not guilty, (2) guilty of first degree murder, and (3) guilty of second degree murder. The court denied defense counsel's request for an involuntary manslaughter instruction, concluding no evidence suggested defendant acted recklessly rather than intentionally. The court stated:

- 3 -

"The testimony is uncontradicted is [*sic*] that he shot and intended to shoot him, and all the argument as presented to me goes to his evaluation of self-defense, and that's consistent with his testimony here. There is nothing that supports any inference or finding that this was done recklessly. That would again all go to the mental state in evaluating the reasonableness of a self-defense. So I'm going to deny the request that involuntary manslaughter be given."

¶ 11 The jury returned a signed verdict form indicating it found defendant guilty of first degree murder. Following the verdict, defendant refused to participate in the presentence investigation and thus did not complete the necessary forms or speak with the court services department representative. At the March 2015 sentencing hearing, the court commented on defendant's refusal to participate in the presentence investigation and considered this refusal indicative of defendant's attitude and rehabilitative potential. The court sentenced defendant to 65 years in prison. Defendant timely filed a posttrial motion to reconsider his sentence and a notice of appeal.

¶ 12 This appeal followed.

¶ 13 II. ANALYSIS

¶ 14 Defendant argues his trial counsel was ineffective for failing to object to the State's use of his post-*Miranda* statement and for failing to request the proper self-defense jury instruction. Defendant also argues the trial court erred by failing to instruct the jury on involuntary manslaughter and using defendant's refusal to participate in the presentence investigation in aggravation at sentencing. Finally, defendant argues his fines have not been offset by his *per diem* credit.

¶ 15 A. The Plain-Error Doctrine

¶ 16 The State maintains several of defendant's claims on appeal are forfeited. "In *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988), our supreme court unequivocally held that for an issue to be preserved for review on appeal, the record must show that (1) a contemporaneous objection to the trial court's error was made, *and* (2) the issue was contained in a written posttrial motion." (Emphasis in original.) *People v. Rathbone*, 345 Ill. App. 3d 305, 308-09, 802 N.E.2d 333, 336 (2003). Otherwise, such issues are procedurally forfeited. *Id.* The plain-error doctrine allows a reviewing court to bypass forfeiture rules to consider a clear or obvious error that occurred at the trial. *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 69, 52 N.E.3d 728; see also Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). As the plain language of Rule 615(a) indicates, "remedial application of the plain error doctrine is discretionary." *People v. Clark*, 2016 IL 118845, ¶ 42, 50 N.E.3d 1120.

¶ 17 The plain-error doctrine may be invoked where the evidence is closely balanced or where the error deprived the defendant of a fair hearing. *People v. Baker*, 341 Ill. App. 3d 1083, 1090, 794 N.E.2d 353, 359 (2003).

"The second prong of the plain error rule should be invoked only when the possible error is so serious that its consideration is necessary to preserve the integrity and reputation of the judicial process. *** [Citation.] The rule is not a general saving

- 4 -

clause for alleged errors but is designed to redress serious injustices. [Citation.]" (Internal quotation marks omitted.) *Id.*

"In both instances, the burden of persuasion remains with the defendant." *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 480 (2005). "As a matter of convention, our court typically undertakes plain-error analysis by first determining whether error occurred at all." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1059 (2010).

¶ 18                              B. Ineffective Assistance of Counsel

¶ 19    Defendant argues his trial counsel was ineffective for failing to object to the State's use of his post-*Miranda* statement and for failing to request the proper self-defense jury instruction. The State maintains defendant forfeited these arguments "by failing to object to either at trial, or to raise [them] in a posttrial motion." We reject the State's argument. Attorneys Randall Rosenbaum and Janie Miller-Jones represented defendant throughout his trial and sentencing hearing. Attorneys are not expected to argue their own ineffectiveness, and failure to do so does not result in forfeiture on appeal. *People v. Lawton*, 212 Ill. 2d 285, 296, 818 N.E.2d 326, 333 (2004).

¶ 20    Both the United States Constitution and the Illinois Constitution guarantee the right to counsel in criminal trials. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. To show ineffective assistance of counsel, a defendant must demonstrate (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance resulted in prejudice to the defendant such that, but for counsel's errors, a different result would have been reached. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Defendants claiming ineffective assistance of counsel must overcome a strong presumption that counsel's conduct was reasonable and effective. *Id.* at 689. Our supreme court has "made it clear that a reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007).

¶ 21                              1. *Alleged* Doyle *Violation*

¶ 22    Defendant argues the State improperly used his post-*Miranda* statement to impeach his in-court account of the events and then commented on his post-*Miranda* statement in closing argument. The State argues defendant's post-*Miranda* statement was not protected by *Doyle v. Ohio*, 426 U.S. 610 (1976), because defendant did not invoke his right to remain silent and the statement to Lieutenant Apperson was inconsistent with his trial theory and testimony. We conclude the State's use of defendant's post-*Miranda* statement was not a *Doyle* violation.

¶ 23    In *Doyle*, the United States Supreme Court held "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. The Court noted "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618. However, the Court also held "a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). "When a defendant waives his *Miranda* rights, and makes statements to police, '[a]s to the subject

matter of his statements, the defendant has not remained silent at all.' " *People v. Hart*, 214 Ill. 2d 490, 514, 828 N.E.2d 260, 273 (2005) (quoting *Anderson*, 447 U.S. at 408). Espousing the Court's holding in *Anderson*, and consistent with the subsequent *Hart* holding, this court held *Doyle* is inapplicable where a defendant waives his right to silence. *People v. Campbell*, 332 Ill. App. 3d 721, 725, 773 N.E.2d 776, 779 (2002). Further, we noted defendant's voluntary post-*Miranda* statements may be probed on direct examination as well as on cross-examination for impeachment purposes. *Id.* at 725, 773 N.E.2d at 780. Accordingly, the proper approach to considering whether *Doyle* is applicable is to first determine whether the defendant has received notice of his or her right to remain silent and then determine whether the defendant invoked the right to remain silent. Where the defendant fails to invoke the right to silence, *Doyle* is inapplicable, and testimony about the inconsistency between the two statements may be elicited at trial. See *id.* at 725, 773 N.E.2d at 779; see also *Anderson*, 447 U.S. at 408; *People v. Frieberg*, 147 Ill. 2d 326, 356, 589 N.E.2d 508, 522 (1992) (concluding no *Doyle* violation occurred when the State cross-examined the defendant about omissions in his post-*Miranda* statement to police where the defendant did not invoke the right to remain silent but omitted significant details to which he testified at trial).

¶ 24        We thus reject defendant's argument he partially remained silent following receipt of his *Miranda* warnings. Defendant did not invoke his right to remain silent and instead recounted to Lieutenant Apperson the events leading up to the shooting. The fact his post-*Miranda* statements omitted details later asserted at trial does not mean the omissions were an invocation of the right to remain silent. See *Campbell*, 332 Ill. App. 3d at 725-26, 773 N.E.2d at 780 ("Omitting facts within a statement does not involve the right to remain silent."). The omission of the details relating to defendant's belief his brother was armed at the time of the shooting in his statement to Lieutenant Apperson was significant, as this belief was the linchpin of his self-defense claim. As in *Frieberg*, because defendant omitted significant details in his statement to Lieutenant Apperson, his "initial version was thus inconsistent with [his] subsequent trial testimony and his theory of defense," and the State was permitted to use that inconsistency to test defendant's self-defense theory. *Frieberg*, 147 Ill. 2d at 356, 589 N.E.2d at 522.

¶ 25        Defendant analogizes his case to *People v. Gagliani*, 210 Ill. App. 3d 617, 569 N.E.2d 534 (1991). In *Gagliani*, the defendant initially indicated to police officers he was not involved in an incident and "did not know what [the officer] was talking about." *Id.* at 621, 569 N.E.2d at 537. The defendant was ultimately prosecuted in relation to the incident and gave exculpatory testimony at trial. *Id.* at 623-24, 569 N.E.2d at 538. The State impeached the defendant's testimony with his prior statement he was not involved and unaware of the incident, which the Second District held was improper impeachment under *Doyle*. *Id.* at 623-24, 627-28, 569 N.E.2d at 538, 541.

¶ 26        Our supreme court commented on *Gagliani* in *Frieberg*, explaining:

          "Following his arrest and *Miranda* warnings, defendant did not remain silent. He related an entire version of events, but denied his knowledge of the cocaine and anticipated drug deal. Defendant also omitted significant details to which he later testified at trial. This initial version was thus inconsistent with defendant's subsequent trial testimony and his theory of defense. Under *Anderson* and [*People v. Rehbein*, 74 Ill. 2d 435, 386 N.E.2d 39 (1978)], the State could properly cross-examine defendant regarding his prior inconsistent statements made following arrest.

*** [W]e find [*Gagliani*] *** to be distinguishable from the present case. *Gagliani* did not concern a situation where a defendant gave authorities any version of events which later proved inconsistent; the defendant simply denied knowledge of the incident. As such, the factual situation, as the appellate court recognized in *Gagliani*, was akin to that of *Doyle*." *Frieberg*, 147 Ill. 2d at 356, 589 N.E.2d at 522.

We conclude *Gagliani* is inapposite for the same reasons the *Frieberg* court explained. To the extent *Gagliani* is inconsistent with our holding, we note we are not bound by the decisions of the other districts. *Banister v. Partridge*, 2013 IL App (4th) 120916, ¶ 42, 984 N.E.2d 598; see also *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892 N.E.2d 994, 1006-07 (2008) ("[T]he opinion of one district, division, or panel of the appellate court is not binding on other districts, divisions, or panels."). Our decision in *Campbell* remains consistent with controlling Illinois Supreme Court and United States Supreme Court precedent, and we thus decline to deviate from it on this issue.

¶ 27    As in *Campbell*, "This case does not involve a *Doyle* violation, but a situation where defendant chose to talk to police." *Campbell*, 332 Ill. App. 3d at 726, 773 N.E.2d at 780. Because *Doyle* was inapplicable to defendant's post-*Miranda* statement, the State was permitted to examine Lieutenant Apperson about defendant's statement and test defendant's self-defense theory in its case-in-chief. See *id.* at 725, 773 N.E.2d at 780 ("there is no reason a defendant's prior statements cannot come in substantively, on direct examination"). Because we conclude no *Doyle* violation occurred, trial counsel was not ineffective for failing to object on *Doyle* violation grounds during either the State's case-in-chief or closing argument. We thus classify this ineffective-assistance claim as a groundless claim.

¶ 28                              2. *Self-Defense Jury Instruction*

¶ 29    With respect to defendant's self-defense claim, the jury was read the following instruction:

> "A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.
>
> However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

This instruction is consistent with Illinois Pattern Jury Instructions, Criminal, No. 24-25.06 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 24-25.06). However, the second paragraph may also read:

> "However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself *[or] the commission of [a forcible felony]*." (Emphasis added.) *Id.*

The committee note states, "When applicable, insert in the blank the forcible felony." *Id.*, Committee Note.

¶ 30    Defendant argues his trial counsel was ineffective for failing to request the forcible felony language because the jury could have reasonably concluded defendant's brother was about to commit either aggravated battery or aggravated discharge of a firearm at the time of

the shooting. The State maintains trial counsel was effective, and the same evidence supporting the theory defendant was protecting himself from an alleged aggravated battery or aggravated discharge of a firearm was necessarily considered by the jury when it considered whether defendant "reasonably believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself." See *id.* In support, the State cites *People v. Chamness*, 129 Ill. App. 3d 871, 473 N.E.2d 476 (1984), and *People v. Hanson*, 138 Ill. App. 3d 530, 485 N.E.2d 1144 (1985).

¶ 31        In *Chamness*, the First District held:

> "When a jury determines whether a defendant acted to protect himself from great bodily harm or death, it necessarily considers the same evidence which would be involved in a determination of whether that defendant acted to prevent the commission of an attempted murder or aggravated battery upon himself. There is no logic in the suggestion that a jury which found that a defendant was not protecting himself from great bodily harm or death could find that that defendant was trying to prevent an attempted murder or aggravated battery from being committed upon himself." *Chamness*, 129 Ill. App. 3d at 876, 473 N.E.2d at 480.

When faced with a similar argument, the Fifth District adopted the reasoning in *Chamness* and concluded the same evidence supporting the theory defendant was protecting himself from an aggravated battery would necessarily be considered by the jury when determining whether the defendant reasonably believed he was in danger of great bodily harm or death. *Hanson*, 138 Ill. App. 3d at 539-40, 485 N.E.2d at 1150-51.

¶ 32        Defendant argues *Chamness* and *Hanson* are distinguishable because the defendants in those cases were charged with aggravated battery and the juries were thus instructed on the crime of aggravated battery, making it "possible for the jury to determine whether the defendants acted to prevent the commission of an aggravated battery upon themselves."

¶ 33        We disagree with defendant's position and adopt the holding in *Chamness*. A jury need not be instructed on the elements of aggravated battery to understand the concept of a threat of great bodily harm or death within the context of self-defense. Because the jury apparently determined defendant was not protecting himself from great bodily harm or death, it could not have found defendant was attempting to protect himself from an aggravated battery or aggravated discharge of a firearm, as the conduct necessary to commit either offense would necessarily be likely to cause great bodily harm or death. Thus, any error resulting from the failure to request the forcible felony portion of IPI Criminal 4th No. 24-25.06 was harmless (see *Chamness*, 129 Ill. App. 3d at 876, 473 N.E.2d at 480), and we classify this ineffective-assistance claim as a groundless claim.

¶ 34                              C. Involuntary Manslaughter Instruction

¶ 35        Defendant next argues the trial court erred by refusing to instruct the jury on involuntary manslaughter. Defendant argues there was sufficient evidence indicating he acted recklessly, such as the facts he was not wearing his glasses and his firearm was allegedly an inaccurate shot. The State argues the court did not err because there was no evidence "presented at defendant's trial suggest[ing] his actions in shooting his brother were anything other than intentional."

¶ 36        We review a trial court's decision to include or exclude a jury instruction for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "Where there is evidentiary support for an involuntary manslaughter instruction, the failure to give the instruction constitutes an abuse of discretion." *Id.* ¶ 31. The standard for determining whether there is sufficient evidentiary support for a lesser-included instruction is "whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." (Emphasis in original.) *Id.* ¶ 25.

¶ 37        First degree murder occurs when an individual "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or *** he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2010). Involuntary manslaughter occurs when an individual *unintentionally* causes the death of another, and his acts, "whether lawful or unlawful[,] *** are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2010). "The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state." *McDonald*, 2016 IL 118882, ¶ 51. First degree murder may be committed either intentionally or knowingly, whereas involuntary manslaughter is committed unintentionally but recklessly.

¶ 38        Defendant was charged with four counts of first degree murder, said four counts alleging (1) defendant intended to kill his brother, (2) defendant knowingly killed his brother, (3) defendant intended to cause great bodily harm to his brother, and (4) defendant knowingly acted to cause great bodily harm to his brother. A person acts intentionally "when his conscious objective or purpose is to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2010). A person acts knowingly when:

> "(a) The nature or attendant circumstances of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that the fact exists.
>
> (b) The result of his or her conduct, described by the statute defining the offense, when he or she is consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(a), (b) (West 2010).

By comparison:

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2010).

Accordingly, our inquiry is whether there is "some evidence" to show defendant acted recklessly and thus without the intent to shoot his brother or without knowledge his actions would result in his brother being shot.

¶ 39        Defendant argues this evidence is established by the facts he was not wearing his glasses and his firearm was allegedly an inaccurate shot. However, defendant misses the point. Whether defendant's actions were actually likely to result in death is not relevant to our

inquiry. We are focused on defendant's *intent* or *knowledge*—or lack thereof—at the time his brother was shot.

¶ 40　　　The State cites *McDonald*, 2016 IL 118882, ¶ 57, in support of its assertion defendant was not entitled to an involuntary manslaughter instruction because the uncontradicted evidence established defendant intentionally shot his brother from a range of four to five feet. Defendant complains that the State provided no record cite for its assertion the evidence is uncontradicted. However, defendant likewise provides no record cite contradicting the State's assertion. Instead, defendant argues his case is distinguishable from *McDonald* and is more similar to *People v. Whiters*, 146 Ill. 2d 437, 588 N.E.2d 1172 (1992). We disagree.

¶ 41　　　In *McDonald*, the evidence established:

> "[The] defendant was trying to prevent [the victim] from leaving by keeping him from taking his bicycle. As they struggled over the bicycle, [the] defendant swung the knife at [the victim], stabbing him three times. There is no evidence that [the victim] threatened [the] defendant. The stab wound to [the victim's] cheek was deep enough to strike the carotid artery. [The d]efendant was not merely swinging the knife recklessly in [the victim's] direction." *McDonald*, 2016 IL 118882, ¶ 57.

The court held, "Given the dearth of evidence of recklessness, we conclude that the trial court did not abuse its discretion in refusing to give a jury instruction on involuntary manslaughter." *Id.*

¶ 42　　　By contrast, in *Whiters*, the evidence established the victim

> "ripped [the defendant's] phone from the wall and threatened to 'kick her ass.' At one point, [the] defendant grabbed a kitchen knife and pointed it at [the victim]. As [the victim] moved toward [the defendant], she stabbed [the victim] in the abdomen. [The defendant] immediately screamed that she did not mean it, and called an ambulance." *Whiters*, 146 Ill. 2d at 440, 588 N.E.2d at 1043.

The *Whiters* court concluded "the record contain[ed] evidence of acts by [the] defendant, which, if believed by the jury, could reasonably be ascertained to be reckless conduct, and which caused [the victim's] death." *Id.* at 441, 588 N.E.2d at 1044. The court specifically pointed to the fact the stabbing occurred while the defendant was merely holding the knife at her waist while the victim moved toward her. Thus, a jury instruction on involuntary manslaughter was necessary. *Id.*

¶ 43　　　Our inquiry comes down to whether defendant's firearm was discharged by means of intent or knowledge or by recklessness. The uncontradicted evidence established defendant knowingly and intentionally pointed a firearm at his brother at a range of four to five feet and knowingly and intentionally pulled the trigger, discharging the weapon. Unlike in *Whiters*, where the defendant merely held the knife at her waist and the victim was stabbed as he moved toward her, defendant intentionally shot his firearm at his brother. The facts defendant was not wearing his glasses and the firearm was allegedly an inaccurate shot have no bearing on defendant's intent. Defendant attempts to analogize this case to *Whiters* by arguing the shooting occurred following a physical altercation between defendant and his brother and defendant believed his brother sometimes carried a weapon. These facts, again, have no bearing on defendant's intent. Rather, they are relevant to his self-defense claim or the argument this offense should be classified second degree murder rather than first degree.

¶ 44    As the *McDonald* court noted, defendant was not merely swinging his firearm about or handling it in a reckless manner, which caused it to discharge—defendant intentionally discharged his firearm while aiming the firearm at his brother. We conclude the trial court did not abuse its discretion by denying defendant's request the jury be instructed on involuntary manslaughter.

¶ 45                    D. Defendant's Refusal to Cooperate With the Presentence Investigation

¶ 46    Defendant next argues the trial court erred by considering his refusal to cooperate with the presentence investigation as an aggravating factor at sentencing. The State maintains defendant forfeited this issue and any weight given to defendant's refusal was insignificant and did not affect defendant's sentence. Defendant concedes he forfeited this claim on appeal but requests plain-error review. We thus begin by considering whether an error occurred.

¶ 47    The Illinois Constitution provides "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Trial courts have wide latitude to determine an appropriate sentence, and we review a court's sentencing decision for abuse of discretion. *People v. Jones*, 168 Ill. 2d 367, 373-74, 659 N.E.2d 1306, 1308 (1995). A court abuses its discretion by fashioning a sentence based upon irrational or arbitrary factors. *People v. Miller*, 2014 IL App (2d) 120873, ¶ 36, 9 N.E.3d 1210.

¶ 48    Both defendant and the State agree defendants enjoy the fifth amendment right against self-incrimination during the sentencing phase, and we likewise agree. Defendant equates his refusal to cooperate with the presentence investigation as an invocation of his fifth amendment right to silence, citing *People v. Ashford*, 121 Ill. 2d 55, 80, 520 N.E.2d 332, 342 (1988). In *Ashford*, our supreme court stated:

"The fifth amendment right against compelled self-incrimination is available, not only at guilt phase, but also at the sentencing phase of a capital murder trial. [Citation.] Whatever information the defendant provided the probation officer could have been used against him at the sentencing proceeding, and he therefore had a right to remain silent." *Id.*

¶ 49    At defendant's sentencing, the trial court stated:

"It is significant to this court and troubling that when Miss Roesch of the Court Services Department went out to interview the defendant in jail, he refused to cooperate with the interview and refused to fill out the social form and the history that was necessary, knowing this court would be reviewing that, knowing that the Court Services Officer, Miss Roesch, was an arm of the court, and he still refused twice to be interviewed and did not fill out the social history form. We do have the earlier form from July of 2011, but he was not excused from cooperating with this process, and that certainly speaks volumes about his attitude, and is something the court takes into consideration in measuring rehabilitative potential. It is a telling indication of defendant's attitude when he refused to cooperate with even the most fundamental step that the court would be relying on in fashioning an appropriate sentence."

We conclude the trial court's remarks were an improper comment on defendant's fifth amendment right to remain silent during the presentence investigation. Defendant had the right to remain silent during the presentence investigation, and invocation of the right cannot

be used as an aggravating factor at sentencing. Having determined the court's reliance on this factor was an abuse of discretion, we now must determine whether the error was so significant as to require remand for a new sentencing hearing. See *People v. Martin*, 119 Ill. 2d 453, 461-62, 519 N.E.2d 884, 888 (1988).

¶ 50       Reliance on an improper sentencing factor is amenable to plain-error review because such reliance "impinges upon defendant's fundamental right to liberty." *People v. Kopczick*, 312 Ill. App. 3d 843, 852, 728 N.E.2d 107, 115 (2000). "However, where it can be determined from the record that the weight placed on the improperly considered aggravating factor was so insignificant that it did not lead to a greater sentence, remandment is not required." *People v. Bourke*, 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340 (1983). The converse of this rule is remandment is required where reliance on the improper sentencing factor was significant and led to a greater sentence. It is clear from the trial court's remarks this factor weighed heavily in the court's sentencing decision. Indeed, the court specifically stated defendant's refusal to participate in the presentence investigation was "significant *** and troubling" and "a telling indication of defendant's attitude." Given the court's comments, we cannot state with certainty this factor did not lead to a greater sentence. We thus vacate defendant's sentence and remand for a new sentencing hearing.

¶ 51                              E. *Per Diem* Credit

¶ 52       Defendant argues his fines have not been offset by his *per diem* credit because the fines appear to have been entered into the clerk's system as "costs" rather than "fines." The State concedes defendant was assessed the following fines, and those fines should be offset by defendant's *per diem* credit, which totals $8475: (1) a $50 court finance fee, (2) a $10 arrestee's medical fine, (3) a $10 state police operations fine, and (4) a $10 traffic/criminal surcharge. We accept the State's concession.

¶ 53       Defendant also argues his $30 juvenile expungement fund assessment is a fine pursuant to *People v. Wynn*, 2013 IL App (2d) 120575, ¶ 16, 3 N.E.3d 400, and his $5 drug court assessment is a fine pursuant to *People v. Warren*, 2016 IL App (4th) 120721-B, ¶ 138, 55 N.E.3d 117. The State does not present an argument relating to these two assessments. We agree both these assessments are fines. See *id.* ¶¶ 134, 138.

¶ 54       Defendant was also assessed a $2 State's Attorney automation assessment, which he argues is a fine pursuant to *People v. Camacho*, 2016 IL App (1st) 140604, ¶ 56, 64 N.E.3d 647, despite our holding the assessment is a fee in *Warren*, 2016 IL App (4th) 120721-B, ¶ 115, 55 N.E.3d 117. Defendant notes our holding in *Warren*, but he invites us to reconsider in light of *Camacho*, which disagreed with *Warren* because "the State's Attorney and public defender records automation assessments do not compensate the state for the costs associated in prosecuting a particular defendant." *Camacho*, 2016 IL App (1st) 140604, ¶ 56, 64 N.E.3d 647. We decline to reconsider our holding in *Warren* and continue to hold the $2 State's Attorney automation assessment is a fee for the reasons stated therein.

¶ 55       In sum, defendant was assessed several fines, which include (1) a $50 court finance fee, (2) a $10 arrestee's medical fine, (3) a $10 state police operations fine, (4) a $10 traffic/criminal surcharge, (5) a $30 juvenile expungement fund assessment, and (6) a $5 drug court assessment. These fines appear from the record to have been classified as "costs," as opposed to "fines," in the clerk's computer system. To the extent these fines have been

improperly classified, we remand to the trial court to correct the classification and apply defendant's *per diem* credit to these creditable fines.

¶ 56                                    III. CONCLUSION

¶ 57        We affirm in part, vacate in part, and remand to the trial court for a new sentencing hearing and to properly classify the following assessments as fines and apply defendant's *per diem* credit to those fines: (1) a $50 court finance fee, (2) a $10 arrestee's medical fine, (3) a $10 state police operations fine, (4) a $10 traffic/criminal surcharge, (5) a $30 juvenile expungement fund assessment, and (6) a $5 drug court assessment. As a part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2014).

¶ 58        Affirmed in part and vacated in part; cause remanded with directions.